**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MARIA A. KUNTZ                          :
                                        :
          Plaintiff,                    :
                                        : CIVIL ACTION
          v.                            :
                                        : NO. 10-cv-00877
AETNA INC.                              :
                                        :
          Defendant.                    :


**MEMORANDUM**

TUCKER, C.J.                                      May _____,

                                                      2013

  Maria A. Kuntz brings this action against Aetna, Inc. ("Aetna") for a denial of long term

disability benefits under an Aetna-sponsored welfare benefit plan.  After exhausting Aetna's

internal administrative review process, Kuntz filed this action pursuant to 29 U.S.C.

§ 1132(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA").  Currently before

me are the parties' cross motions for summary judgment under Rule 56 of the Federal Rules of

Civil Procedure.  For the reasons set forth below, I will grant Kuntz's motion for summary

judgment; accordingly, Aetna's motion for summary judgment will be denied.

**I.  FACTS AND PROCEDURAL HISTORY**

  Kuntz worked as a claims processor for Aetna for fifteen years, beginning in July of 1993.

(R. at 502.)  As an Aetna employee, she was eligible to participate in an ERISA-governed,

employer-sponsored, self-insured welfare benefit plan (the "Plan"), administered by Aetna Life

Insurance Company ("ALIC").  (Def. Aetna Inc.'s Resp. in Opp'n to Pl.'s Mot. Summ. J. 2.)  The

Plan included a long term disability ("LTD") benefit plan.  (*Id.*)

In early 2007, Kuntz gave birth to her second child.  After taking maternity leave, she returned to work in June 2007.  (R. at 549.)  Approximately one month later, Kuntz began experiencing anxiety that she claims impacted her ability to perform the functions and duties of her job.  (*Id*.)  Toward the end of July, she sought medical attention from her primary care provider to address her anxiety and fatigue.  (*Id*.)  Her lab results did not show any medical reason for her symptoms.  (*Id*.)  Nevertheless, Kuntz continued to seek treatment from her primary care provider through the remainder of 2007.  On November 29, 2007, Kuntz left Aetna on short term disability ("STD") leave.  (*Id*. at 362, 549.)

On December 21, 2007, Kuntz visited The Mitchell Psychiatric Center in Emmaus, Pennsylvania, where John F. Mitchell, M.D., a board-certified psychiatrist, performed an initial evaluation, including a mental status examination ("MSE").  (R. at 527.)  The record of the initial evaluation states that Kuntz's thought content and perception were "logical," her memory was "OK," her attention and concentration were "fair," her insight and judgment were both "good," and that she was alert with normal motor activity.  (*Id*. at 528.)  Mitchell assigned her a current Global Assessment of Functioning ("GAF") score of "40-70."[1]  (*Id*.)  He also stated that her mood appeared sad and hypervigilant, and noted sleep disturbance.  (*Id*.)  Mitchell's diagnosis stated social anxiety, performance anxiety, and panic disorder.  (*Id.*)

Kuntz continued to see Mitchell approximately once a month throughout her STD leave.

---

[1]"A Global Assessment of Functioning rating, or GAF rating, 'is a subjective determination of the physician's judgment (on a 100–point scale) of the claimant's overall ability to function on that particular day, excluding physical and environmental impairments.'" *Bair v. Life Ins. Co. of N. Am.,* 09-cv-00549, 2011 WL 4860006, at *18 (E.D. Pa. Oct. 13, 2011) (quoting *Long v. Astrue,* No. 08-cv-1787, 2009 WL 5033973, at *1 n.1 (E.D. Pa. Dec. 21, 2009) (Pollak, S.J.) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders IV* 34 (4th ed. text rev. 2000))).

(*Id*. at 529-30.)  On March 3, 2008, Kuntz returned to her position as a senior claims processor for Aetna.  (*Id*. at 298.)  Upon return, Kuntz's supervisor informed her that she would need to increase her work week from twenty-five hours to forty hours per week.  (*Id*.)  On March 5, Kuntz met with Mitchell and reported that since returning to work her depression and sadness were "clearing," and although she did not feel agitated, she was anxious and panicky.  (*Id*. at 529.)  Then, on March 7, Kuntz called Mitchell and explained that she was not doing well at work because she was feeling panicky and tearful, and as a result was going to pursue a medical leave of absence.  (*Id*.)

Kuntz resumed her STD leave on March 8, 2008.  In addition to seeing Mitchell, she also began to meet with Robin Rooth-Fogel, a licensed clinical social worker employed at The Mitchell Psychiatric Center.  (*Id*. at 516-17.)  Kuntz visited Rooth-Fogel weekly for several months following her initial visit in early April.  (*Id*. at 516-17, 594.)  By the end of summer 2008, the visit intervals were lengthened to approximately once every three weeks.  (*Id*. at 594.)

On April 28, 2008, ALIC wrote to Kuntz and informed her that her STD benefits would terminate on May 28, 2008.  (*Id*. at 494.)  ALIC advised Kuntz that if she wished to seek LTD benefits she needed to provide specific information and documentation concerning her disability within thirty days, or her file would be closed.  (*Id*.)  Kuntz promptly submitted her request for LTD benefits to ALIC.  (*Id*. at 392.)  On May 7, 2008, ALIC again wrote Kuntz and asked for additional information in order to make a decision on her claim.  (*Id*. at 498.)  Specifically, ALIC requested the following: copies of Mitchell's office visit notes; test results that would medically support a claim on an ongoing basis from November 1, 2007, until the present day; the initial evaluation; and any documentation from other counselors in his office.  (*Id*.)  Additionally, ALIC

requested that Kuntz sign an "Authorization for Aetna to Request Protected Health Information" form, and asked that Mitchell complete an "Attending Physician Behavioral Health Statement" ("APS"), along with the last office visit note from the disabling provider.  (*Id*. at 499.)

On June 27, 2008, after reviewing the requested information, including additional information provided by Rooth-Fogel at ALIC's request, ALIC denied Kuntz's request for LTD benefits.  (*Id*. at 543-45.)  Susan Dunn, a senior disability analyst for ALIC, stated that ALIC's medical staff reviewed the information submitted by Kuntz, Mitchell, and Rooth-Fogel, and determined that the file showed "limited and inconsistent findings" with respect to Kuntz's diagnosis of agoraphobia and panic disorder.  (*Id*. at 544.)  Furthermore, Dunn stated that Rooth-Fogel "did not provide sufficient exam findings of [Kuntz's] emotional impairment and the symptoms specified did not meet the impairment determination protocol for panic disorder." (*Id.*)  Finally, ALIC found that the information provided did not explain how Kuntz's impairment in emotional and cognitive functioning would preclude her from performing as a claims processor.  (*Id*.)

Pursuant to her rights under the Plan, Kuntz appealed the denial of LTD benefits.  In support of her appeal, she submitted two letters to ALIC that further explained the severity of her symptoms and addressed the discrepancies in ALIC's review of her file.  (*Id*. at 549-61.)  Rooth-Fogel also submitted a letter on Kuntz's behalf, asking for further consideration of her LTD claim and providing a description of her symptoms, with an explanation as to how they would limit her ability to work.  (*Id*. at 546.)  Additionally, Mitchell provided a response to a follow-up questionnaire pertaining to Kuntz's symptoms, treatment regimen, prognosis, and barriers to improvement—a response that ALIC had requested for its initial review.  (*Id*. at 542.)

4

On August 29, 2008, after a review of the record by ALIC's appeals committee, which included a review by Dr. Ivy E. Sohn, an independent consulting peer physician board certified in psychiatry, ALIC denied Kuntz's appeal for LTD benefits.  (*Id*. at 576.)  Sohn, noted that Rooth-Fogel's psychotherapy notes did not contain any MSEs or descriptions of symptom frequency, severity, or duration.  (*Id*. at 577.)  Additionally, there was no explanation as to how the symptoms prevented Kuntz from performing her occupation.  (*Id*. at 578.)  Sohn stated that the symptoms described were not consistent with the requirements for a diagnosis of panic attacks according to the *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV (TR)*"), noting that losing color in one's face and headaches were not included in the enumerated symptomatolgy.  (*Id*.)  She also noticed a lack of MSEs and objective tests of cognitive functioning in Mitchell's treatment notes.  (*Id*.)  Additionally, Sohn deemed some of Mitchell's findings to be inconsistent where, for instance, he would note observed improvement but yet conclude an impairment in Kuntz's occupational functioning.  (*Id*.)

On October 2, 2008, Kuntz requested reconsideration of the denial of her appeal.  (*Id*. at 581.)  Again, she submitted a letter further explaining what she believed were discrepancies in the denial of her appeal.  (*Id*. at 581-85.)  Rooth-Fogel submitted another letter describing Kuntz's panic attack and agoraphobia symptoms, situations that triggered her symptoms, and the impact such symptoms would have on her ability to function as a claims processor.  (*Id*. at 586.)  Mitchell submitted a one-paragraph letter clarifying that what he had described as "job interviews" in his office visit notes were actually visits to survey possible venues for Kuntz's son's birthday party.  (*Id*. at 587.)

ALIC reviewed the file in its entirety, including the information submitted subsequent to

the denial of the appeal.  (*Id.* at 592.)  In addition, Dr. Marcus J. Goldman, a new independent

peer physician board certified in psychiatry, also reviewed the file.  (*Id.*)  On November 19, 2008,

based on ALIC's findings and Goldman's assessment of the record, ALIC denied Kuntz's claim

with finality.  (*Id.*)  Subsequent to that decision, Kuntz filed a complaint against Aetna in the

Court of Common Pleas for Northampton County challenging ALIC's denial of LTD benefits.

Aetna timely removed the action to the Eastern District of Pennsylvania.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine issue

of material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Notwithstanding, "Where the decision [of an ERISA-governed plan] to grant or deny benefits is

reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring

the legal question before the district court and the usual tests for summary judgment, such as

whether a genuine dispute of material fact exists, do not apply."  *Davis v. Broadspire Servs., Inc.*,

No. 05-5829, 2006 WL 3486464, at *1 (E.D. Pa. Dec. 1, 2006) (quoting *Bendixen v. Standard*

*Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)) (internal quotation marks omitted).

ERISA "permits a person denied benefits under an employee benefit plan to challenge

that denial in federal court."  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).  "[A]

denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard

unless the benefit plan gives the administrator or fiduciary discretionary authority to determine

eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v.*

*Bruch*, 489 U.S. 101, 115 (1989).  When a plan confers such discretionary authority on an

administrator or fiduciary, however, the district court reviews the administrator's denial of

benefits under an "arbitrary and capricious," or abuse of discretion, standard.  *See id.*; *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 844-45 (3d Cir. 2011).  "An administrator's decision is arbitrary and capricious 'if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.'"[2] *Miller*, 632 F.3d at 845 (quoting *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)) (internal quotation marks omitted).  "This scope of review is narrow, and 'the court is not free to substitute its own judgment for that of the defendants in determining the eligibility for plan benefits.'" *Abnathya*, 2 F.3d at 45 (quoting *Lucash v. Strick Corp.*, 602 F. Supp. 430, 434 (E.D. Pa. 1984)).  Nevertheless, while "the arbitrary and capricious standard is extremely deferential, '[i]t is not . . . without some teeth.  Deferential review is not no review, and deference need not be abject.'" *Moskalski v. Bayer Corp.*, No. 6-cv-568, 2008 WL 2096892, at *4 (W.D. Pa. May 16, 2008) (quoting *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)).

Here, the Plan language is clear that ALIC holds the discretionary authority to determine eligibility for Plan benefits.  Furthermore, the parties agree that the proper standard of review is the arbitrary and capricious standard.  The only question that remains with respect to the standard of review is whether a conflict of interest exists in Aetna's administration of the plan such that it should be considered as a factor in reviewing ALIC's denial of benefits.  Kuntz argues that such a conflict of interest exists.  I disagree.

As the Supreme Court stated in *Firestone Tire & Rubber Co. v. Bruch*, "if a benefit plan

---

[2]The Third Circuit has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012) (quoting *Soubik v. Dir., Office of Workers' Comp. Programs*, 366 F.3d 226, 233 (3d Cir. 2004)).

gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187, cmt. d (1959)).  In *Metropolitan Life Insurance Co. v. Glenn*, the Court held that a conflict of interest exists where "the entity that administers the plan . . . both determines whether an employee is eligible for benefits and pays benefits out of its own pocket."  *Glenn*, 554 U.S. at 108.  Kuntz agues that exactly such a situation exists here because Aetna both "determines whether an employee is eligible for benefits and pays benefits out of its own pocket," (Pl.'s Mot. Summ. J. 7), and asks the court to consider the conflict as a factor upon review.

It appears that Kuntz misunderstands the structure for the administration of the Plan and the disbursement of its funds.  Aetna has granted ALIC the discretionary authority, as claims administrator, to decide who is eligible to receive LTD benefits.  (R. at 175.)  Once ALIC determines that an employee is eligible for benefits, the benefits are paid from Aetna's funds.  (R. at 142 ("The Plan described in the following pages of this Booklet is a benefit plan of [Aetna].  These benefits are not insured with [ALIC] but will be paid from [Aetna's] funds.")).  The Third Circuit has recognized that when an administrator both determines eligibility and disburses the funds, a conflict of interest is present.  *See Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 383 (3d Cir. 2000) (stating that conflict of interest exists when employer pays an independent insurance company to "fund, interpret, and administer a plan"), *abrogated on other grounds*, *Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009).  On the contrary, when an employer funds the plan but pays a third party, or creates an internal benefits committee to interpret the plan and administer benefits, then the presumption is that a conflict of

interest does not exist.  *See id*.  Thus, the key factor in determining if a conflict of interest exists is whether the decision to administer benefits is vested in an entity other than the one that funds the plan.  Here, such separation exists: ALIC decides whether to award benefits, and Aetna funds the plan.  Furthermore, as plaintiff, Kuntz bears the burden of demonstrating that a conflict of interest exists, *see Kotrosits v. GATX Corp. Non-Contributory Pension Plan for Salaried Employees*, 970 F.2d 1165, 1173 (3d Cir. 1992), and here she has not provided me with any other evidence to support her argument aside from her conclusory statement alleging as much.  Accordingly, I conclude that a conflict of interest does not exist, and that the appropriate standard of review is the arbitrary and capricious standard.

## III.   DISCUSSION

The bulk of the parties' cross motions are concerned with whether there was an abuse of discretion in the denial of Kuntz's LTD benefits.  Aetna, however, begins its reply brief in support of its motion for summary judgment with the argument that because it did not make any decision regarding Kuntz's claim for LTD benefits it is not a proper defendant in this action; ergo, summary judgment must be granted in its favor.  (Def. Aetna Inc.'s Reply in Supp. of Mot. Summ. J. 1-2.)  Aetna makes this argument without citing to any authority for its proposition.  Nevertheless, I will start my analysis by addressing this argument first, and then move on to a review of the record for an abuse of discretion.

### A.   Aetna Is a Proper Defendant

Section 1132(d) of ERISA provides the following:

(1) An employee benefit plan may sue or be sued under this chapter as an entity.  Service of summons, subpoena, or other legal process of a court upon a trustee or an administrator of an employee benefit plan in his capacity shall constitute

service upon the benefit plan. . . .

> (2) Any money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity . . . .

29 U.S.C. § 1132(d)(1)-(2).  In expounding on this statutory language, the Third Circuit has stated, "In a § 1132(a)(1)(B) claim, the defendant is the plan itself *(or plan administrators in their official capacities only*)."  *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 301 (3d Cir. 2007) (emphasis added).  "Thus, if entitlement to benefits is established, the court can direct the plan administrator to pay them from the assets of the plan, much as a trustee may be compelled to satisfy a trust obligation from trust assets." *Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300, 308 (3d Cir. 2008).  Accordingly, based on both the statutory language and the Third Circuit's interpretation of that language, it appears clear that Aetna, as a plan administrator sued in its official capacity, is a proper defendant in this action.

> **B.  Aetna's Review Was Arbitrary and Capricious**

Aetna's chief argument is that ALIC's denial of benefits cannot be considered arbitrary and capricious because Kuntz's "treating psychiatrist and therapist did not provide sufficient evidence in which ALIC could find [that Kuntz] was unable to perform the material duties of her job . . . ." (Def.'s Mot. Summ. J. 2.)  It argues that a lack of objective medical evidence in the record is a sufficient basis upon which to deny Kuntz LTD benefits.  After a thorough review of the administrative record, based on the information available to ALIC at the time of its final review, I conclude that while there may have been limited objective medical information, there was an abundance of subjective evidence that was completely uncredited or unconsidered such that ALIC's decision to deny benefits was arbitrary and capricious.

To be eligible for LTD benefits, an applicant must meet the definition of disability as supplied by the Plan. The "Test of Disability" under the Plan states the following: "You will be deemed to be disabled on any day if you are not able to perform the material duties of your own occupation, for more than half a day, solely because of: disease or injury." (R. at 143.) The Plan defines material duties as duties that "are normally required for the performance of [one's] own occupation and cannot be reasonably: omitted or modified." (*Id*. at 152.)

Kuntz served as a senior claims processor. The administrative record reflects that, within its internal communications, ALIC described Kuntz's job as one that required her to "sit[] at desk on computer, processing claims." (R. at 362.) This is in sharp contrast to how Kuntz described her position in ALIC's "Work History and Education Questionnaire." There, Kuntz described the tasks and functions of her job as follows:

> Process Aetna health insurance claims; assist other processors; answer claims questions from processors and customer service reps; assist other supervisors with their priority claims processing; maintain routed claims screen; maintain claims per hour and claims accuracy.

(R. at 502.) The administrative record does not provide the job description that ALIC and its independent peer reviewing physicians used in determining whether Kuntz could perform the material duties of her job. The work-related incidents present in the record, which describe a collective work environment, combined with the fact that Kuntz served as a *senior* claims processor (which suggests some collaborative, even if not supervisory, role with co-workers), demonstrate that Kuntz's duties fall more in line with her description than the marginal description provided in ALIC's internal file. Thus, that is the description I shall use in determining whether ALIC's denial of benefits was arbitrary and capricious. *See Weinberger v.*

*Reliance Standard Life Ins. Co.*, 54 F. App'x 553, 556 (3d Cir. 2002) (rejecting generic and

minimalist job description used by plan administrator); *Lundquist v. Cont'l Cas. Co.*, 394 F.

Supp. 2d 1230, 1250-51 (C.D. Cal. 2005) (finding administrator minimized plaintiff's job

functions and, therefore, decision to deny benefits was not entitled to deference).

On November 19, 2008, ALIC had in its possession the following information, upon

which it denied Kuntz's claim for LTD benefits:

- Kuntz's Work History and Education Questionnaire, dated May 12, 2008
- Attending Physician Behavioral Health Statement ("APS") from Dr. John F. Mitchell, dated May 7, 2008
- John F. Mitchell and Rooth-Fogel progress notes dated January 11, 2008; February 1, 2008; March 5, 2008; March 17, 2008; March 27, 2008; April 3, 2008; April 10, 2008; April 15, 2008; April 17, 2008; April 24, 2008; April 29, 2008; May 5, 2008; May 6, 2008; May 13, 2008; and May 22, 2008
- Letter from Mitchell, dated June 3, 2008
- Initial evaluation from Mitchell, dated December 21, 2007
- Medication list from Mitchell dated December 21, 2007; February 1, 2008; March 5, 2008; March 27, 2008; April 15, 2008; and May 13, 2008
- Rooth-Fogel's June 18, 2008 response to Aetna's questionnaire
- Rooth-Fogel's letter to Aetna, dated July 17, 2008
- Kuntz's Daily Record of Dysfunctional Thought, dated June 8-July 5, 2008
- Kuntz's appeal letters, dated July 17, 2008, and July 22, 2008
- Kuntz's letter of clarification pending reconsideration, dated October 2, 2008
- Rooth-Fogel's letter to Aetna, dated September 23, 2008
- Mitchell's letter to Aetna, dated October 10, 2008

(R. at 576, 580-587.)

It appears ALIC's final denial of Kuntz's claim, which came on November 19, 2008, was

largely based on the recommendation of its independent peer physician consultant, Dr. Marcus J.

Goldman.  In his brief report, Goldman stated that psychiatric functional incapacity was not

adequately supported by objective data.  (*Id*. at 594.)  To support his conclusion, he cites the lack

of detailed MSEs, the lack of objective data in Mitchell and Rooth-Fogel's notes, and the

absence of partial hospitalization or intensive outpatient care required for Kuntz.  (*Id*. at 595.)

Furthermore, he gives very little credit to Mitchell's and Rooth-Fogel's conclusions that due to

Kuntz's mental impairments she is unable to work, because he states that the data are almost

"exclusively subjective and self reported [sic]."  (*Id*. at 594.)

      Similarly, Aetna's denial of Kuntz's first appeal, which occurred on August 29, 2008, is

primarily based on the recommendation of another independent peer physician consultant, Dr.

Ivy E. Sohn.  Sohn had an opportunity to peruse all of the aforementioned documents in

developing her recommendation, except for the letters sent by Kuntz, Mitchell, and Rooth-Fogel

to ALIC in support of Kuntz's request for reconsideration.  Sohn concluded that the

documentation submitted did not support impairment in occupational functioning.  (*Id*. at 579.)

      To support her conclusions, Sohn cites a lack of objective medical data in Rooth-Fogel's

psychotherapy notes; specifically, she notes an absence of MSEs.  (*Id*. at 577.)  In addition, she

states that the symptoms that Rooth-Fogel describes for Kuntz's panic attacks are not supported

by the DSM IV-TR.  (*Id*. at 578.)  After reviewing Kuntz's pharmacology history, Sohn

concludes that Kuntz's medicinal dosage was far too low, and therefore, "inconsistent with the

proclaimed severity of symptoms and impairment in functioning."  (*Id*.)  Sohn also takes issue

with Mitchell's GAF score on December 21, 2007, noting that Mitchell provided a range of "40-

70 with no indication of the GAF on that date."  (*Id*.)  Finally, after reviewing Mitchell's

psychiatric treatment notes, Sohn concluded that Kuntz's progress was inconsistent with an

impairment in occupational functioning.  (*Id*. at 579.)

      In an ERISA case, "plan administrators are not obliged to accord special deference to the

opinions of treating physicians."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825

(2003). "Conversely, plan administrators 'may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.'" *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d 261, 289 (W.D. Pa. 2008) (citing *Nord*, 538 U.S. at 834). Similarly, "[courts] have held it unreasonable to reject [a claimant's] self-reported evidence where," such as here, "the Administrator has no basis for believing it to be unreliable." *Schwarzwaelder v. Merrill Lynch & Co., Inc.*, 606 F. Supp. 2d 546, 563 (W.D. Pa. 2009).

Here, both Sohn and Goldman gave very little weight to the opinions of Mitchell and Rooth-Fogel, and almost entirely dismissed Kuntz's self-reported evidence. Goldman, for example, explicitly stated that the data are "almost exclusively subjective and self reported [sic]," before going on to note an absence of "serial, detailed mental status examinations," and a lack of "objective data" in Rooth-Fogel's clinic notes. (R. at 594-95.) He then concluded that, based on the lack of information, functionality would not have been precluded. While I acknowledge that an administrator is under "no discrete burden of explanation when [it credits] reliable evidence that conflicts with a treating physician's evaluation," *Nord*, 538 U.S. at 834, here Goldman failed to address (and there is little evidence that he even considered) the evidence that conflicted with his assessment of Kuntz. Specifically, he never discussed Kuntz's GAF scores of 40 and 50 contained in Mitchell's initial assessment and APS, or Mitchell's recommendation that she reach a score of 60 before returning to Aetna.[3] Goldman made no mention of Rooth-Fogel's repeated assessments in letters to ALIC that Kuntz would be unable to perform the duties of her job if

---

[3]According to the *DSM-IV (TR)*, a patient with a GAF score of 50 would possess "serious symptoms or any serious impairment in social, occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders IV* 34 (4th ed. text rev. 2000)) . The *DSM-IV (TR)* provides, as an example, that a person with a GAF of 50 would be "unable to keep a job." *Id*.

forced to return, nor did he reference Mitchell's recommendation of June 3, 2008, that Kuntz would be unable to work because of the specific ways in which her job functions would be impaired.  Moreover, he did not address Rooth-Fogel's September 23, 2008 letter to ALIC that included a revised list of Kuntz's panic attack symptoms that placed Kuntz within the recognized criteria for a panic attack in accordance with the *DSM-IV (TR)*.  *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders IV* 432 (4th ed. text rev. 2000)).  Finally, Goldman never addressed any of Goldman's self-reported evidence.

Perhaps more concerning than Goldman's complete disregard of the assessments and opinions of Mitchell and Rooth-Fogel is Sohn's selective use of treatment notes to bolster her recommendation for a denial of benefits.  In her report, Sohn is quick to point out that Kuntz's GAF on December 21, 2007, was between 40 and 70,[4] and that a score of 70 "'reflects some mild symptoms' or 'some difficulty in social, occupational or school functioning but generally functioning pretty well.'" (R. at 578.)  She failed to mention, though, that a score of 40 reflects "some impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders IV* 34 (4th ed. text rev. 2000)).  Likewise, Sohn cherry picked Mitchell's psychiatric treatment notes, highlighting statements demonstrating improvement, yet failing to address entries that show otherwise.  For

---

[4]Sohn critiques Mitchell's initial assessment with respect to the GAF, stating, "The GAF was noted to be 40-70 with no indication of the GAF in that date."  (R. at 578.)  The *DSM-IV (TR)* states that an appropriate method for recording a GAF, however, is to record the current GAF score, followed by the highest score in the past year.  *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders IV* 33 (4th ed. text rev. 2000)).  If that was the method followed by Mitchell, then it's possible that Kuntz's score for that day was annotated: 40.

example, Sohn referenced Mitchell's treatment note of March 5, 2008, which states that Kuntz

was back to work and "depression/sadness clearing."  She disregarded the very next entry, dated

March 7, 2008, which states "not doing well at work—panicky and tearful—will pursue [medical

leave of absence]."  (R. at 529.)  The entry on March 27, 2008—also not referenced by

Sohn—states that Kuntz "feels wiped out, weepy, dizzy. . . .  Fears triggered when socially on the

spot."  (R. at 530.)  Sohn mentioned that the April 15 therapy note states that Kuntz "went to two

interviews"; however, she omitted from her report the statement that immediately followed: "felt

exhausted."  (*Id.*)  Similarly, while highlighting the fact that she "got thru Aiden's birthday with

35 adults" from the May 6 entry, she disregarded the statement that concluded the entry: "still

lots of fears."  (*Id.*)  This "selective, self-serving use of medical information is evidence of

arbitrary and capricious conduct."  *Moskalski*, 2008 WL 2096892, at *9 (citing *Porter v.

Broadspire and Comcast Long Term Disability Plan*, 492 F. Supp. 2d 480, 491 (W.D. Pa.

2007)).

       In her report, Sohn also analyzes Kuntz's pharmacology history, noting that the low

medicinal dosages were "inconsistent with the proclaimed severity of the symptoms and

impairment in functioning."  (R. at 578.)  Kuntz later explained in a letter to ALIC that the

dosage levels were low because at that time she was breastfeeding her son.  (*Id*. at 581.)  In its

reply brief, Aetna advances the argument that because Kuntz "elected" to nurse her child, her

condition did not stabilize like it would have had she taken the proper dosages of medication.

(Def.'s Reply 4.)

       After informing ALIC of the reason for the lower dosages, however, neither ALIC nor

Goldman, who would have then been privy to her explanation, addressed Kuntz's medicinal

history in upholding the denial of benefits.  It is not clear from the record whether ALIC accorded

the low medicinal dosages any weight when arriving at its final decision; regardless, that

information is considered and argued as a factor for denying benefits in Aetna's reply brief.  (*Id*.)

"[A]lthough there is not much caselaw on a claimant's right to not take medications that could

endanger her child while breastfeeding, courts have generally permitted a claimant to refuse

treatment for a disability for much less dire reasons."  *Walls v. Barnhart*, No. 01-2361, 2002 WL

485641, at *12 (E.D. Pa. Mar. 28, 2002) (citations omitted).  Therefore, to the extent that ALIC

relied on Kuntz's medicinal history to deny her claim, that information should not have been

considered; thus, it does not serve as evidence—much less *substantial* evidence—upon which

ALIC could have based its decision.

 Neither Goldman nor Sohn address any of Kuntz's self-reported evidence of impairment.

Kuntz provided ALIC with very specific examples as to how her anxiety affected her ability to

work.  She explained that upon being approached by a co-worker she would flee to the bathroom

or lactation room.  (R. at 549.)  She would incessantly monitor the instant messaging program on

her computer to see who was logging on or off, so as to provide her with a warning as to who she

may expect to stop by her desk, making it "impossible to concentrate on [her] work."  (*Id*. at

550.)  She stated that as of July 17, 2008, she was "avoid[ing] all places where I believe I may

see someone I know."  (*Id*.)  In her letter to ALIC on October 2, 2008, she clarified that the "two

job interviews" that she attended, which were noted by Sohn as demonstrating marked

improvement, were actually visits to possible birthday party venues for her one-year-old son that

did not go well, as she felt anxious and panicky and was left "wiped out and exhausted."  (*Id*. at

582.)  The examples continue.

17

As previously stated, ALIC is not under an obligation to address each and every example provided by Kuntz when denying her benefits.  It must, however, credit Kuntz's self-reported evidence unless it has some reason not to.  In ALIC's internal communications, there is a slight reference—a "red flag"—to Kuntz's request to go back out on short term disability when told by her supervisor that she would need to resume a forty-hour work week.  (R. at 391, 583.)  There is no other evidence in the record, however, to support the implication that Kuntz's anxiety and panic attacks were a facade to allow her to remain at a twenty-five hour work week.  In fact, the only other evidence concerning the red flag is a rebuttal by Kuntz, with an explanation that she was always aware that she would return to a standard work schedule.  (*Id*. at 583.)  Thus, there is not sufficient evidence upon which Aetna could disregard Kuntz's self-reported evidence, and here is appears that it did not consider her evidence whatsoever.  This also weighs in favor of a finding that the denial of benefits was arbitrary and capricious.

ALIC's failure to address how Kuntz was expected to perform the duties of her job given her ailments also supports a finding that the denial of benefits was unreasoned.  "[A]n administrator's proper consideration of the claimant's ability to perform his or her job requirements in light of the relevant diagnosis is a significant factor to evaluate on arbitrary and capricious review."  *Miller v. Am. Airlines*, 632 F.3d 837, 854 (3d Cir. 2011).  "[I]t is essential that any rational decision to terminate [or deny] disability benefits under an own-occupation plan consider whether the claimant can actually perform the specific requirements of a position."  *Id*. at 855.  Here, through the evidence provided by Kuntz, Mitchell, and Rooth-Fogel, ALIC was aware that Kuntz could not grocery shop, could not take her daughter for ice cream, could not order food from a fast food restaurant even if it was via the drive-thru, had difficulty taking her

18

children to day care, and had difficulty leaving her home.  (R. at 557, 561, 594.)  When confronted by people she knew, Kuntz experienced an increased heart rate, her body and hands would begin to shake, her breathing became labored, and she became light headed, all of which was followed by a severe headache.  (*Id*. at 551, 586.)  In addition, in his June 3, 2008 letter to ALIC, Mitchell stated that Kuntz was unable to work with others, give supervision to others, cooperate with others in a group setting, and interact with supervisors.  (*Id*. at 519.)

ALIC denied Kuntz's request to work from home, citing budgetary constraints and a requirement that Kuntz would still have to conduct regular office visits.  (*Id*. at 388.)  Therefore, because no modification was available, Kuntz needed to be able to execute the duties "normally required for the performance of [her] occupation" in its normal setting—the office—or else she would meet the definition of "disabled" under the Plan.  Yet, despite the evidence explaining her inability to function in a social setting, ALIC never addressed how it expected Kuntz to perform her job.  The fact that ALIC relied on examples like Kuntz's attendance of her son's birthday party—which she left numerous times due to her anxiety—as evidence that she did not have a psychiatric functional incapacity, without explaining how Kuntz was expected to perform the material duties of her job over an eight-hour work day, counsels toward a finding that its decision was unreasoned.

Aetna cites a lack of objective medical evidence as a sufficient basis for the denial of LTD benefits.  I agree that both Mitchell's and Rooth-Fogel's reports are lacking in objective medical data, such as mental status examinations.[5]  Be that as it may, "In contrast to some

---

[5]I find Mitchell's cursory evaluations and written response to ALIC's follow-up questions to be particularly frustrating, not only to the court in reviewing the record, but more significantly to his patient.  Perhaps had Mitchell taken the time to conscientiously engage with ALIC during

physical impairments, which can be verified or discounted solely by the reference to reports of objective tests, mental impairments are generally identified on the basis of a psychiatric professional's interactions with an impaired individual." *Haisley v. Sedgwick Claims Mgmt. Servs., Inc.*, 776 F. Supp. 2d 33, 50 (W.D. Pa. 2011). The Plan permits, but does not require, ALIC to conduct an independent medical examination ("IME") of the claimant. (R. at 71.) Here, ALIC elected not to conduct an IME of Kuntz, but instead relied on the cold reviews of the paper record by two non-examining psychiatrists. "[A] decision to forego an IME and conduct only a paper review, while not rendering a denial of benefits arbitrary *per se*, is another factor to consider in the Court's overall assessment of the reasonableness of the administrator's decision-making process." *Schwarzwaelder*, 606 F. Supp. 2d at 559 (citing *Glenn v. Metlife*, 461 F.3d 660, 671 (6th Cir. 2006)). In a case such as this, where a decision to deny LTD benefits rested so heavily on a lack of objective medical data from a seemingly uncooperative psychiatrist, the prudent measure would have been to conduct an IME to assess the rather strong subjective evidence of a disability. *See Haisley*, 776 F. Supp. 2d at 49 ("[T]he failure to procure [an IME] may be unreasonable where the specific impairments or limitations at issue are not amenable to consideration by means of a file review.") (citing *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006); *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d 261, 296 (W.D. Pa. 2008)). Thus, while ALIC's recognition of a lack of objective medical information in the record is correct, its reliance on a paper review by non-treating psychiatrists, its disregard of the subjective evidence of the claimant and the reports of the treating psychiatrist and therapist,

its review, and not taken such actions like refusing to conduct an outreach call unless compensated, this matter would have been resolved without involving the limited resources of the federal judiciary.

and its decision to forego an IME, all suggest that the decision was arbitrary and capricious.

"[B]enefits determinations arise in many different contexts and circumstances, and, therefore, the factors to be considered will be varied and case-specific." *Estate of Schwing*, 562 F.3d at 526.  The administrative record reflects that ALIC decided to forego an IME and rely instead on the reports of non-treating physicians who grounded their recommendation to deny benefits in an absence of objective psychiatric data in the paper record, while ignoring the evidence of the claimant and lending very little credit to the reports and recommendations of the treating physicians, at the same time never explaining how it expected the claimant to perform the material duties of her job given her impairments.  Therefore, upon careful review of the record that was before ALIC, I conclude that its decision was not reasoned, nor was it based on substantial evidence; thus, the decision was arbitrary and capricious.

### C.    Appropriate Remedy

"When benefits have been improperly denied, a district court has discretion to 'either remand the case to the administrator for a re-evaluation of the claim or retroactively award benefits." *Farina v. Temple Univ. Health Sys. Long Term Disability Plan*, No. 08-2473, 2009 WL 1172705, at *15 (E.D. Pa. July 1, 2010) (quoting *Addis v. Limited Long-Term Disability Plan*, 425 F. Supp. 2d 610, 620 (E.D. Pa. 2006)).  Here, Aetna's denial of benefits was the result of an arbitrary and capricious decision, not because it had an incomplete record, misinterpreted the Plan, or applied an incorrect standard of review.  *See id*.  Accordingly, it is appropriate to retroactively award benefits.

Under the Plan, LTD benefits are available for twenty-four months.  (R. at 71, 143.)  If a claimant starts work at any reasonable occupation during that time, however, she will no longer

be deemed to be disabled.  (*Id*. at 143.)  Kuntz's LTD benefits should have commenced on June

4, 2008.  Whether she ever began work in a reasonable occupation following June 4, 2008, is not

before the court.  Accordingly, Kuntz will provide any post-June 4, 2008 employment history to

the court and Aetna within fourteen days from the date of the order that follows.  Thereafter,

Aetna will reinstates LTD benefits for a period of twenty-four months, unless it determines that

she accepted employment at a reasonable occupation during that time.  Should that have

occurred, benefits will only be awarded for the time period that Kuntz was unemployed between

June 4, 2008, and the start of her job.

  Kuntz also asks for interest on the unpaid benefits.  "[A]n ERISA plaintiff who prevails

under [§ 1132(a)(1)(B)] in seeking an award of benefits may request prejudgment interest under

that section as part of his or her benefits award."  *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d

193, 208 (3d Cir. 2004).  "Thus prejudgment interest should ordinarily be granted unless

exceptional and unusual circumstances exist making the award of interest inequitable."  *Id*.

(quoting *Anthius v. Colt Indus. Operating Corp.*, 971 F.2d 999, 1010 (3d Cir. 1992)) (internal

quotation marks omitted).  Because this case does not present exceptional or unusual

circumstances that would make an award of prejudgment interest inequitable, Kuntz's request

will be granted.

  Finally, Kuntz seeks reasonable attorney fees.  "There is no presumption that a successful

plaintiff in an ERISA suit should receive in an award [of attorney fees] in the absence of

exceptional circumstances."  *McPherson v. Emp.'s Pension Plan of Am. Re-Ins. Co., Inc.*, 33

F.3d 253, 254 (3d Cir. 1994).  While exceptional circumstances do not appear to be present,

because such a determination requires me to consider the five factors announced in *Ursic v.*

*Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir. 1983), and articulate my analysis and conclusions in consideration of those factors, *see McPherson*, 33 F.3d at 254, I will require briefing on this issue before rendering a decision.

## IV.    CONCLUSION

For the foregoing reasons, Kuntz's motion for summary judgment will be granted, while Aetna's motion for summary judgment will be denied.  An appropriate order follows.